Good morning, everyone. We are glad to have everyone gathered here today, and we are going to start with our first case of the morning, case number 23-3061, Hunter v. Elanco Animal Health. And is it Mr. Cry? Correct, Your Honor. Thank you. All right, Mr. Cry. Your Honors, may it please the Court. The District Court rejected the complaint in this case because plaintiffs had not alleged that Elanco had engaged in a channel stuffing scheme that was itself fraudulent and illegal. That holding disregards the basic allegations of the complaint, the theory on which it rested, and the structure of Rule 10b-5. This case involves allegations of false and misleading statements about the reasons for Elanco's revenue growth. It does not involve allegations that Elanco engaged in channel stuffing that was itself illegal or fraudulent. Rule 10b-5b independently prohibits companies from making false or misleading statements about the conduct they engage in that would be material to investors. Whether or not that underlying conduct is also independently a fraudulent scheme or practice under Rule 10b-5a. And that's the fundamental flaw that undergirds the District Court's entire opinion. The Second Circuit, in the Hines-Celestial case, reversed the District Court for committing that exact same error. In that case, just like here, the District Court had rejected claims of channel stuffing because there was no allegation that the channel stuffing itself was fraudulent or illegal. But here, just like in Hines-Celestial, the Second Circuit explained that whether or not a complaint states a claim for false or misleading statements about channel stuffing does not depend on the legality of the underlying conduct. What matters is whether Elanco made materially false or misleading statements about the reasons for its revenue growth. And that's exactly what Elanco did in this case. So, Mr. Craig, can I ask you, the various statements that were made by Elanco and its officers reference what they call the underlying demand? So, in context, Your Honor, I think the fairest interpretation of that term is underlying demand means the underlying consumer demand, the underlying end-user demand that is driving the ultimate demand for Elanco's products. As opposed to the demands of the direct customers, the distributors. Correct, Your Honor. Because if they were just referring to distributor demand, it's hard to see why they would use the underlying word. Underlying what? I mean, their immediate demand to the distributors they're directly selling to. So, even if there's ambiguity on that point, I think definitely the fair reading and the one investors would most likely draw is that those are references to end-user demand. And that's not just coming from that word alone. It's also coming from the very words that Elanco used when they referred to underlying demand. Were there other statements that Elanco made, by Elanco I mean, Elanco writ large, that instead of using the term underlying demand, they just used the term demand when they were referencing their direct customers? You know, I think when they were referencing their direct customers, they almost always used the term underlying demand. So, the examples we collect in paragraph 131 of the complaint, there's a reference from the CEO who talks about the underlying demand coming out of the clinics or the strong underlying demand at the clinic level. That's from paragraph 140. And then there are situations where they do use underlying demand without in the same breath saying demand. So, for example, paragraph 124 talks about the demand pull through in vet clinics and then a little bit later talks about underlying demand. So, we think in that context especially, where Elanco's just repeatedly using the term underlying demand to refer to clinic or end-user channel demand, what investors are going to understand from those comments is that they're talking about how much the ultimate end-users of their products want them, how much they're able to move out to the ultimate consumers of the product, not how much inventory they've managed to pile up at their distributors through exorbitant rebates and other channel stuffing schemes. What evidence do you have, though, that if we come at that same question from a different angle, that the demand was not real? So, yeah. No, this is not a fictitious revenue case. We're not alleging that they violated... I'm pretty much going more so to the SciENter question. I'm trying to move a little bit into the SciENter question. Sure. So, we think that there's ample allegations in the complaint that the two principals of Elanco that made these statements, Mr. Simmons and Mr. Young, knew that when they said that Elanco's revenue growth was being driven by end-user demand, that was not true. And they knew it was being driven by the mounting inventories that were piling up. And I think there's basically six categories of evidence we would rely on for purposes of that SciENter. And the first three are categories of direct evidence. So, in paragraph 78 of the complaint, we have Elanco's former head of global animal care expansion attended monthly management meetings throughout 2019 where documents, reports were presented directly to Mr. Simmons and by Mr. Young that showed a consistent delta between the selling numbers and the dispensing numbers. So, that is an allegation that they had in front of them, reports that showed that there was this consistent gap between how much was going to distributors and how much was going to end-users. Not only that, but this individual- But I guess to follow up on Judge Pryor's question, why does that indicate some sort of nefarious intent? Well, that alone- I mean, because there will always be a gap, won't there, between presumably the distributors who want some inventory and they're forecasting kind of what their customer demand will be. And as part of that, their inventory will fluctuate over time. And so, it seems like it's economically prudent for Elanco to make sure it understands what the inventory is so that it can plan for the future. So, I'm trying to understand why that's kind of nefarious. Right. So, that is not what paragraph 78 alleges. It doesn't say that distributors consistently had some inventory as a buffer. What it says is that every month there was a consistent gap between how much was going into distributors and how much was going to end-users. So, yes, I for sure agree it would be rational for distributors to carry some inventory. But if you have a situation where every month you're selling a certain amount to distributors, that is problematic. And maybe it's not independently illegal, but it does put those principles on notice that when they go out to the market and say, our wonderful revenue figures are because of this burgeoning end-user demand, they know it's not true because they saw these reports that every month showed them that there was this consistent delta. They were pushing more into the distributors than the distributors could resell. But you do not need to take my word for it because what paragraph 78 also alleges is that they were specifically confronted, challenged over this practice during these monthly management meetings. Elanco's global head of animal care expansion was an eyewitness to those exchanges. And that individual reports that the CEO and the CFO were specifically challenged on the channel stuffing practices that were reflected in these reports. And so that is well beyond, I mean, that's a big problem for Elanco. And Mr. Krajewski, I interrupted you when you were going through the various factors in response to Judge Pryor's question. Yes, that would be number one. And that's corroborated also by Elanco's corporate account manager who also attended some of those meetings. The second category is that that same corporate account manager also testified that there were days on hand reports and roll-up reports that both Mr. Simmons and Mr. Young reviewed on a monthly basis. And a days on hand inventory report, I mean, by its very name, that is a report that those reports that they're reviewing again and again and again throughout the year, show this days on hand continually going up and reaching stratospheric levels, like over 120 days of inventory, just wildly beyond what's normal in the industry. That too is noticed that they knew that when they told the market, the reason our revenues are going up is because of end user demand, that was false. And it was misleading because the reason those revenues were going up is because they were driven by channel stuffing. Number three is the monitoring that Mr. Young and Mr. Summons told the market themselves that they engaged in. Paragraph 117 of the complaint, Mr. Simmons says, we look every day at that debt clinic demand. So these end user sales are not some line that are buried in the recesses of the company's accounting systems. This is something that the CEO and the CFO of the company told the market they were looking at every day. And number four, you know, now we get into what I would call circumstantial evidence, because there's a lot of that too. And so one example is the testimony of the report that was given by Elanco's corporate account manager, who explained that that individual superior, Courtney Shriver, whenever Mr. Shriver attended a meeting with Mr. This was not based on personal information knowledge. This was based on, for lack of a better, just from someone else from hearsay. It's not hearsay, Your Honor. That's why I'm asking. It's not hearsay, because what what that witness recounted was that every time there was a meeting, so he had personal knowledge of the fact that Mr. Shriver was meeting with Mr. Simmons and Mr. Young. And every time right after that, what happened is Mr. Shriver would say, okay, go ahead and engage in all these aggressive rebate and channel stuffing practices. And so the fact that, you know, the timing of those two things happening one after the other is circumstantial evidence that tends to add to all the direct evidence we have, because it suggests that Simmons and Young were the source of the instructions that Mr. Shriver then relayed. And clearly, you know, if you were saying that this corporate account manager relayed what somebody else had told somebody else, that would be hearsay. But this is not hearsay. This is a recurring pattern, where right after these meetings that the CEO and the CFO attended, CW1 got these instructions to then go off and engage in channel stuffing. But again, isn't that a little bit of a stretch to suggest that from that conversation that this confidential witness would have had what the directive was? Because he's attempting to link what's happening in the room where he is not present with what the direction is being given. I'm just trying to, because the district court did do a weighing. Okay, so I, you know, we would not claim this is independently sufficient evidence of channel stuffing, but it does tend to reinforce what's going on. And in that same vein, we also have the risk factor. They added to the reports in November 2019. And this is when they decided to add to their, like right at the tail end when the channel stuffing was really nearing its breaking point, they add a risk factor to their public reports that says, and I quote this, increased or decreased sales resulting in a higher or lower inventory levels that could result in customer demand being in advance of or trailing the revenue. So, you know, a completely anodyne, uninformative risk factor, but it does use the word inventory. And it just communicates so little that I think the only fair way to read that risk factor is they realized this was a problem and they wanted some risk factor somewhere they could later point to if somebody, you know, tried to hold them to account for that. I'm sorry. I guess looking at it from, kind of stepping back and looking at it from like the 20,000 foot perspective. These distributors are there, so these distributors are buying from Elanco and then they have, they're hoping to sell it, right? And so in other cases that you cite, they had provisions that allowed the distributors to unconditionally sell back or return products they couldn't sell, right? And the courts in those decisions found that that was a significant factor in basically saying that these quote unquote sales were just pre-taxed, right? Here, the rate of return over the class action period is extremely low. In fact, it decreases over the class action period. And so I'm trying to understand what economic incentive would distributors have to buy products that they didn't think they could sell? And if they did think they can sell it, well, how is meeting that customer demand somehow improper? Okay. So first of all, meeting that customer demand is improper, is not improper. The suppliers to pile up inventory and pile up inventory. But it's the supplier's decision, right? Whether or not, I mean, Elanco's customers, Elanco, sure, in the end, Elanco wants end users to want Elanco products, but because it benefits Elanco indirectly, because it creates demand for their distributors. And in return, their distributors then want more products from Elanco. And so when distributors buy this excess inventory from Elanco, aren't the distributors taking the risk that they may not be able to sell it? And so if that's the case, and maybe distributors are wrong. Maybe they can't sell it. Maybe they're right. But Elanco is looking at the kind of market as a whole and trying to assess what the demand is, presumably also based upon what their distributors are doing or how much the distributors are selling. And so I'm trying to figure out, economically speaking, it all seems very plausible to me what happened here. And so I'm just trying to understand where you think that there's something economically untoward or unsound that can only be explained by this misrepresentation. Okay. The reason why distributors would be incentivized to purchase this product is that they were getting these whopping 20% rebates or rebates that kicked in only after 90 or 120 days. So they wouldn't be doing this but for those rebates. But those rebates were disclosed, right? They were part of the gap accounting and Elanco disclosed those to the market. So the market knew that that's how these were being sold. So once again, I'm trying to see what the problem is with Elanco. You said there's no And so if Elanco is using those sales as a factor in trying to gauge underlying demand, and Elanco has disclosed through its accounting practices how exactly what its relationship with the distributors are, I'm still trying to understand how it is that market was deceived or how Elanco was deceiving the market. The market was deceived because Elanco said the reason our revenue figures are going so high is because of end user demand. And that wasn't true. The reason was because inventories were going to stratospheric levels at distributors. So that is the problem. And the fact that Elanco may have told the market, we use rebates does not then allow it to turn around and lie about the reason why inventories are going up so much. And two other important points on this. Number one, we are not making this stuff up. There was an independent analyst from Evercore who published a report shortly after the corrective disclosure in this case. And he interviewed numerous distributors in Elanco's distribution change precisely to figure out what was going on there. And the conclusion that that independent analyst drew was that this had nothing to do with the pandemic. This need to get rid of $60 million or $140 million of excess inventory was precisely because Elanco had been selling inventory at much higher rates than distributors could move out. So independent analyst research confirms the plausibility of the complaint's allegations. But is there any allegation, and we're going to back up for a minute, is there any allegation in the record that Simmons and Young, when confronted about channel surfing, how they responded? Right. So the complaint explains how they challenged at these meetings about channel suffering. So how did those Simmons and Young respond to that pressing? They stayed the course. They continued to engage in channel stuffing practices until it reached its breaking point in December of 2019. And that's when they realized this couldn't go on anymore. They were getting too much pushback. And so they just made the decision. Is it your contention that they represented, though, or admitted the business practice of channel stuffing? I want to make sure that we're clear. Is that the allegation? Because we were saying that they were challenged. And so my question to you is more pointed in what was the response? Sorry, if the question is how did they respond at those particular meetings? Yes, that we don't have in evidence or in the pleadings. But obviously, that would be something we'd want to explore during discovery. The relevance of those meetings is that they were on notice. They knew facts that alerted them that the representations they were making to the market about the reasons for the revenue growth were wrong. How they responded to those allegations in meetings would certainly be interesting to know. But that doesn't mean that they weren't on notice. They were still on notice. And then the last point I make, and this is also responsive to the issue you raised, Judge Lee, is about motive. Because there are reasons that Ilanco did this. And that, as we've described, include the corporate transactions. Given the amount of time that we have, I wonder if you could address causation. Sure. Because from what I understand, one of the distributors did experience a decrease in the supply. And so I was wondering if you can address causation. Yes. So you referred to two things there. First of all, the inventory going down, there was one supplier for one product line where inventories went down between January and June of 2019. There's certainly nothing in the complaint that suggests that overall inventory levels went down and everything in the complaint is to the contrary. With respect to the COVID-19 pandemic, the complaint has ample allegations from which a jury could find that the COVID pandemic was not, or at least not the only reason that Ilanco found itself in a situation where it had to reduce these enormous inventories. And there's a few different things I'd point to. Number one is the same report from Mr. Rafat at Evercore. He looked at this specific issue for the specific purpose of deciding whether Ilanco's representations, what it told the market, that the reason it suddenly had to get rid of $140 million worth of inventory was because of the COVID-19 pandemic was true or not. That's what he looked at. And what he concluded was maybe the COVID-19 pandemic had something to do with it, but I don't think that was most of the reason. Based on the research he did, based on the distributors he talked to, he concluded and told the market that the main reason they had to get rid of all the success inventory was that they had been selling distributors more than the distributors needed or wanted or were able to resell. And so again, don't take our word for it. That's independent research from a market analyst who analyzed this for the specific purpose of deciding whether this was COVID-19 or whether it was channel stuffing. That's not the only thing because- Mr. Kraj, you're beyond your rebuttal time. Thank you. But you can finish your answer to Judge Lee's question and then we should see if we'll have you back. Thank you. And so I will point to Mr. Rafa's testimony. The other thing is the complaint explains how the decision to stop the channel stuffing activity occurred in December of 2019 and that makes no sense if the COVID-19 pandemic is causing that because that really only emerged at the very end of March of 2020. And then the third thing is that the distributors, the other firms in the same industry, did just fine during the first quarter of 2020. They really didn't get hit until later that year because the pandemic was just emerging. And so if the reason why Elanco had to get rid of $60 million of inventory in first quarter of 2020 was because of the COVID pandemic, then that's just your honor that even if the COVID pandemic might have caused part of the loss, the complaint plausibly alleges that it certainly did not cause all of the loss and I'll reserve the rest of our time. Thank you, Mr. Kraj. You don't have time to reserve, but we'll give you some time. Mr. Silbert. Thank you and may it please the court. I'm Greg Silbert from Weill for Elanco. I'd like to begin with your questions, Judge Lee, about distributor relationships and then address your questions, Judge Pryor, about Scienter. Well, actually, I wanted to start with where we ended, which was loss. Loss causation. Okay. Can I put that on the list or would you like to start there? I'm going to ask you a question about it right now. Yes, please. So Elanco decided to start working down its inventories in the fourth quarter of 2019. And so does the fact that they did that necessarily mean that Elanco had started implementing the plan and much less completed it in the same quarter? We look at the complaint, the second amended complaint, and it says because their distributor channels had become overloaded, they decided to change their strategy in the fourth quarter of 2019 and then began working down the inventory in the first quarter of 2020. So what's implausible about that sequence of events that the plaintiffs have alleged in the complaint? Yeah. And let me add one more allegation from the complaint to the ones that you just mentioned that I think is illuminating. That's the allegation about inventory levels at the end of 2019, fourth quarter of 2019, because there's a very interesting correlation that the complaint alleges... I'm sorry, 2018. Very interesting correlation that the complaint alleges about channel inventory in Q4-18 and Q4-19. And what's interesting is those inventory levels are exactly the same. In both quarters, plaintiffs say the channel was completely stuffed, Q4-18 and Q4-19. Then you look at what plaintiffs alleged happened in 19. I know this is leading up to an answer to your question, Judge, I promise. If you look at what plaintiffs allege happened in 2019, and they acknowledge this at page six to seven of their reply brief, they allege that inventory levels went down and down substantially. This is at paragraph 66 and 72 of their complaint. So when the channel is fully stuffed, and in the midst of what they say is the channel stuffing scheme, they allege in paragraph 68 that the channel stuffing scheme was in full swing, that Alenco was heavily relying on channel stuffing all through the first half of 2019 up to the beginning of the class period. And what do they allege happened to channel inventory? Exactly what you said, Judge Lee, channel inventory fluctuates. And according to their own allegations, the inventory went down and down substantially in the first half of 2019. So what that shows, Your Honor, and this goes to your loss causation question, is that even when channel inventory levels are what plaintiffs call completely stuffed, that inventory can and was then sold through to end users. Because remember, as Judge Lee also pointed out, there is no dispute that return levels during the so-called channel stuffing scheme were extremely low, and in fact, significantly lower than return levels prior to the alleged channel stuffing scheme. So we know from plaintiff's own allegations that what they call a completely stuffed channel can then be sold through to end users. Now you said, Your Honor, what about what they allege was the stuffed channel at the end of 2019? Exact same thing. No reason to think, based on Alenco's past experience, that that inventory would not be sold through to end users. As Judge Lee pointed out, the distributors are spending their own capital on that money, on that inventory. They have no incentive to spend that money unless they think they can sell it through. They can't return it, as in Hine and the other cases that plaintiffs rely on. So they're buying it because they think they can sell it. Alenco's recent experience shows that they can sell it. Then plaintiffs say, well, and this is where you started, Your Honor. Well, but in 2019, they say, you made a decision to change strategy. Well, that decision that they're referring to in 2019, Your Honor, was a decision to consolidate distributors from eight down to four. If you read the May 9th statement that Mr. Simmons makes that is in the complaint, which plaintiffs say was when the so-called truth was revealed, what he says is, we consolidated distributors from eight to four. We gave those four distributors specific demand generation targets. That began in 2020. Then I met with them. Mr. Simmons met with them each and every month to analyze how the distributors were doing with respect to demand generation. He then concluded, and he points out this is different from their historical practice, that distributors were not driving demand at the same levels that they had in the past. That is the only kind of change in policy that's really alleged at the end of 2019 is the consolidation of distributors. None of that suggests that the channel inventory levels in Q4 2019 were somehow unsustainable or could not be sold to end users. In fact, plaintiffs' own allegations state that when Elanco had the exact same level of inventory in Q4 2018, that level of inventory was sold through to end users. That brings out what I think is the principal failure of this complaint, Your Honor, which is it does not have one particularized allegation about what end user demand actually was. The premise of the lawsuit is that Elanco knowingly sold more inventory into the distribution channel than end users could absorb, but not once do plaintiffs tell you how much inventory end users actually could or did absorb. Now, compare the absence of allegations in this case about demand to the allegations that were present in Tell Labs, the last case that this court had about channel stuffing. In Tell Labs, there were false or misleading. The defendant's largest customer had slashed orders. It was an independent study commissioned by the defendant that cost $100,000 that concluded that demand had evaporated. There was an internal memorandum inside the defendant company that predicted that revenues would fall by hundreds of millions of dollars. There were fabricated purchase orders resulting in massive returns of products that the defendant's customers had never actually ordered and didn't want. Given all that, when the president of the defendant company was asked, how is demand doing for this product? He responded, growth is continuing or something to that effect. There was ample reason based on the allegations in the complaint to conclude that that statement might be misleading. Here, you have the exact opposite. You have anodyne statements about growth and demand remaining strong, or we feel good about demand in the clinic level, or we're happy with our growth. And at the same time, the plaintiff's own allegations show that while, yes, the company was aggressive as it should be in making sales to its customers, its direct customers, the distributors, who, remember, also buy our competitors' products. They buy Elanco products and they buy our competitors' products. What do we do with the allegation here, at least in the complaint that this information, this business strategy was not shared? Because it's the omission. Because maybe we need to answer that question under subsection B, does there need to be the channel stuffing itself, does that need to be fraudulent? The channel stuffing itself does not need to be fraudulent, but the plaintiffs do have to make a particularized allegation that shows why a statement is false or misleading. Now, when you mentioned disclosures, Judge Pryor, the use of distributors to drive demand was disclosed. In fact, that was disclosed as early as the IPO registration statement in 2018. Also disclosed were the use of sales incentives, like rebates or discounts, to drive sales to Elanco's direct customers, the distributors. And also, as Judge Lee mentioned, all of these sales were properly accounted for in the quarter that they were made, including accounting for any rebates or discounts. So what we have are real sales to distributors to incentivize demand at the end-user level. That strategy was disclosed. The discounts that are used to incentivize those sales to distributors was disclosed. And all of these sales were properly accounted for. Mr. Silver, you were going to talk a bit more about the relationship between Elanco and its distributors. You mentioned that the distributors are not exclusive distributors. In other words, distributors buy from Elanco and they buy from other competitors. And so what benefit does Elanco gain by its distributors buying more Elanco products versus its competitor products? The benefit to Elanco, Judge Lee, is that those distributors are then incentivized to sell of Elanco products to the distributors. They can't return it. They pay for the products, and then the distributors own them. And when the distributors own them and they can't return them and didn't return them, the distributors now bear the risk of loss. So if the distributors say, let's say they have 120 work days of inventory, right? It's Elanco's—and that's total inventory. It would be Elanco's economic interest to make sure that they have as big a portion of that 120 days' access as possible compared to its competitors, because then the distributors would be economically incentivized to push Elanco products to end users. That's exactly right, Judge Lee. And that incentivized the distributors were disclosed. All those sales were real sales, not fake sales like Hein and the other cases that plaintiffs rely on. And all of the sales were properly accounted for. So yes— Plaintiffs indeed allege that Elanco repeatedly—I'm looking for the exact language—repeatedly disclosed information about their inventory, their rebates, so forth, so on, all the things you've just discussed. But they've reminded us in their view, it's just too general, too vague. What's your response? Well, I don't think— The references to those particular items. Yeah. I think what my friend Mr. Kreis said was too vague, and I believe this is what Your Honor was referring to, is risk disclosures about changes in channel inventory levels. I think it's, first of all, important to look at the timing of many of those disclosures. One of them forms the basis of Plaintiff's Securities Act claim, right? And that very same risk disclosure, which you'll find at paragraph 199 of their complaint in the securities context, is also alleged at paragraph 151 in the Exchange Act context. So they claim that risk act—I'm sorry, that disclosure was both unlawful under the Exchange Act and the distributor levels or relationships could affect our business. That doesn't seem to be false or misleading in any way. And second, with respect to the securities registration statement in particular—and this is true of all of their Securities Act claims—remember the timing. The registration was filed in July of 2019. So this is a period where, again, by Plaintiff's own allegations, you had the channel completely stuffed, according to them, in Q4 2018. And what happens in 2019? Well, they tell you themselves at page 6 to 7 of their reply brief and 17 to 18, that channel inventory level goes down by a lot during the exact same period that plaintiffs say the channel's being stopped. So there's no reason for Elanco to think or disclose at any time during that period that, hey, because we had X level of inventory at the end of 2018, that means that our sales are going to fall off a cliff or our business is going to collapse or anything else. What it shows, what Plaintiff's own allegations show, is that for a long time—and remember, Plaintiff's alleged that the channel stuffing, as they refer to it, began even before Elanco's IPO, even before it separated from Eli Lilly. So it was going on, according to them, for some two years. What Plaintiff's allegations show is that strategy was working. And as you pointed out, Judge Lee, the distributors are buying the inventory because they want it, and they bear the risk of loss. They would not buy it if they didn't think they could sell it. And Plaintiff's own allegations show that they did sell it. I don't want to lose your question about Scienter, Judge Pryor. Would it be okay if I went to that? So what Plaintiff pointed to first with respect to Scienter is an allegation by Confidential Witness 4, saying that he saw a consistent delta between selling and dispensing numbers. And Confidential Witness 4 makes a similar statement. At paragraph 83, he says inventory levels went up, up, up. Now, the first thing to point out about that, once again, is that Plaintiff's own allegations contradict it. Compare paragraph 66 and paragraph 72 of their complaint, where they talk about inventory levels in 2019. And what those paragraphs show, and again, what Plaintiff's acknowledge, is that inventory levels at the very largest distributor went down. And I believe I heard my friend, Mr. Pryor say, well, that was one distributor and it doesn't mean anything. First of all, MWI was the largest distributor that Alanco had, according to the allegations in the complaint. Second of all, according to the allegations in the complaint, the food or farm animal business, which is what those allegations concern, was the majority of Alanco's business during the class period. And third, according to, again, Plaintiff's own allegations, feed additives, which were the subject of those allegations that I just referred to, were especially conducive to channel stuffing because they had such a long shelf life. So those allegations concerns the core of Plaintiff's case with respect to channel stuffing. And what they show is not what CW4 supposedly said, consistent delta, or if there was a delta, what it would mean is that distributors were selling more to end users than they were buying from Alanco. And again, remember during this exact period where Plaintiff's acknowledge that inventory levels were dropping, Plaintiff's also allege, and this is at paragraph 68 of the complaint, that Alanco was heavily relying, their words, heavily relying on channel stuffing and that the distribution channels were completely stuffed as of the beginning of the class period, which was May 2019, the exact period in which the levels of inventory in the channel were dropping and dropping significantly. So not only do Plaintiffs not have any particularized allegations about what end user demand was that would render any In addition, their own allegations contradict their theory that if the channel is stuffed, according to them, hit its peak back in Q4 2018, that that inventory cannot or would not be sold through to end users. What is your view of what underlying demand means? What did Alanco mean by that? I think the most natural reading of that phrase underlying demand is demand by distributors. I think my friend asked what is it underlying? What it's underlying is the growth and performance of the company. That's the answer to that question. And when Alanco was referring to that clinic demand, it said specifically demand at the vet clinic. In almost every case, those statements were in the nature of we feel very good about that clinic demand, which is puffery and immaterial, or we watch vet clinic demand every day. My friend quoted that one when he was up at the lectern that is not alleged to be false. So we think that what the references to demand we believe are most naturally read to refer to demand by Alanco's direct customers. Just to shift really quickly to answer that question, I want to talk about just a little bit the Securities Act, section 11 and 12a. What, in your view, would have been the appropriate, should have been rule 9b or rule 8 and explain why? Well, so I think that at least with respect to the second statement that the plaintiffs allege under the Securities Act, which is the risk disclosure, the appropriate lens for that statement is rule 9b, because as I mentioned, that exact same statement, I mean verbatim, word for word, is alleged to be both a Securities Act violation and also an Exchange Act violation. Obviously, the Exchange Act claim does sound in fraud. And the only difference is that that same language once appeared in a registration statement and once appeared somewhere else. But it's the exact same words. I don't think where the statement is made makes a difference to the market. And again, there's no difference in theory about why that statement was supposed to be false. Plaintiffs essentially quote a number of sort of anodyne statements about demand or growth and then say, you know, false because channel stuffing. So it's essentially, and I think to compare, you could see the Securities Act claim makes the allegation at paragraph 199. It's at paragraphs 150 and 151 for the Exchange Act. But it's the exact same theory. And so that theory sounds in fraud when it's an Exchange Act claim. It sounds in fraud when it's a Securities Act claim. And so Rule 9b would apply. But to be clear, Your Honor, we don't think that the distinction between Rule 9 and Rule 8 ultimately would change the outcome here. Because, you know, that's a risk disclosure. It's not false. The only other statement that the plaintiffs challenge under the Securities Act says our revenue grew 6% in 2018 compared to 2017. Three percent of that was due to higher prices and three percent of that was to volume. There's no allegation that that statement is even false. And it doesn't reference demand. It's simply a report about, you know, year over year revenues and what portion of the revenue growth was attributable to increased prices versus increased volume. That's certainly not false or misleading. Okay, Mr. Silver. Is that your concluding thought? No, thank you, Your Honor. We believe that you should affirm. Mr. Krey, we'll give you three minutes. Thank you, Your Honor. And I do just want to make a couple quick points in response. First, the fact that Elanco used rebates and sales incentives was certainly disclosed in very general, very vague terms. But nowhere did Elanco disclose that it was using rebates that were designed to have the effect of stuffing its distribution channels. It used special incentives where distributors got extra rebates if they held inventory for 120 days. It had special rebates that only kicked in during the last week of the quarter where it had every incentive to shift sales early. And so without those additional specific disclosures, no investor would have realized that what was going on here was channel stuffing from the mere fact that Elanco said we use rebates. Second point, Judge Lee, you know, Your Honor, asked a number of questions today about possible economic theories why it might make sense for a company to change its strategy and fill up its distributors with 120 days of inventory. Maybe there's some competitive reason for that. And that may well be true. But the fact remains, even if it's economically rational to do that, you can't then turn around and lie to the market about why your revenues have gone up. And that's what the problem was here, is they didn't go to the market and say the thing that's driving our end user, the thing that's driving our revenue is the fact that we've changed our inventory strategy and now all our distributors are holding twice as much. What they told the market was the reason why our revenues have gone up is because of the robust growth in our end user demand. And it doesn't matter whether they had an economically rational reason to come up to start channel stuffing or to double their inventories or do something else. You cannot lie to the market about why your revenue is growing up. And that's the core of our case. Mr. Cray, how would you address the statements by Mr. Silbert that the complaint does not have any allegations with regard to the actual end user demand and in what way the statements were false? So coincidentally, that was my third point, Judge Lee. And in fact, the complaint does that, allege that, because what it says is that when this reached its breaking point, the LANCO itself told us how much the channel stuffing had been. It said we have $80 million of inventory we had to reduce in the first quarter, pardon me, $60 million and another $80 to $100 million in the second quarter. And then Mr. Rafat from Evercore looked in that and said, yeah, those reductions are not because of the COVID pandemic. They're because of channel stuffing. So there is a dollar figure put on precisely that. When you combine those two allegations, what it showed is that a LANCO stuffed its distribution channels to the tune of $140 to $160 million. And then it spent 2020 working that inventory back down. My fourth point is that the way the LANCO responds to our arguments here about cases like Hein and Telabs is those cases are even worse. There they had fictitious revenues. They had an unrestricted right to return. They were sending people products they didn't even order. And that's just not a valid defense in a securities fraud suit. If you violated the statute, you can't defend yourself on the ground that there's another case where somebody else did something even worse. This case stands or falls on whether they made false and misleading statements about the reasons for a LANCO's revenue growth. And they did that. And for that reason, this case should be allowed to proceed. Thank you, Your Honor. Thank you, Mr. Craig. We thank the parties and we'll take the case under advisement.